*In re* MARRIAGE OF MURIEL NITZKIN *et al.*—(MURIEL NITZKIN, Petitioner-Appellant, *v.* DONALD L. NÏTZKIN, Respondent-Appellee.)

First District (1st Division)   No. 77-1799

Opinion filed November 6, 1978.

Grant, Grant & Stein, Chartered, of Chicago (Jerome Marvin Kaplan, of counsel), for appellant.

Hoffman & Davis, of Chicago (Maurice L. Davis and Robert G. Higgins, of counsel), for appellee.

Mr. PRESIDING JUSTICE GOLDBERG delivered the opinion of the court:

Muriel Nitzkin (petitioner) has appealed from a judgment dissolving her marriage and from an order entered on the same day denying her petition for varied relief.

In this court, petitioner has limited her contentions to the entry of the judgment dissolving the marriage. Petitioner urges that the property settlement agreement incorporated into the judgment was not voluntarily entered into and was unfair to her. Donald L. Nitzkin (respondent) urges that property settlement agreements are favored in actions for dissolution of marriage; the settlement agreement embodied in the judgment was voluntarily approved by petitioner in open court and the agreement was not unfair to petitioner.

These parties were married in 1948. Three children, all of legal age, were born. There is no contest regarding the grounds for dissolution of the marriage.

Concerning the property settlement agreement, petitioner commenced the action on February 17, 1976. Petitioner owns and operates a retail store in Evanston for women's clothing. She has been in this business for 7 years. She has three employees and she performs various services in connection with the business, including buying trips. The record is not definite regarding the employment of respondent.

Petitioner was represented by counsel of her own choice. It is evident from the record that her attorney handled the matter with diligence and ability. The case was brought to issue, there was considerable legal skirmishing and depositions were taken.

Trial was commenced on March 9, 1977. The trial court was advised that no issue would be raised on the merits of the marriage dissolution and that the problems between the parties arose out of settlement of property rights. Prior to March 9, 1977, the parties and their counsel had participated in four pretrial conferences. Four settlement proposals had been considered by petitioner and her counsel. The trial court had entered into discussion with the parties and counsel regarding a possible property settlement. The trial court suggested that perhaps the parties could work out a sale of the marital home and division of the proceeds.

Petitioner testified briefly on the grounds for dissolution and then related her business activities. Joint Federal income tax returns filed by the parties for 1974 and 1975 were offered in evidence. These returns showed, among other figures, that petitioner's business grossed $227,000 in 1975. Petitioner's income for that year was $34,395 and respondent reported no income. For 1974, petitioner reported a net income of $40,219.96. Respondent reported total income of $16,370 from commissions. After a colloquy between the parties, the court directed further consideration of a possible settlement agreement between the parties and suggested that they obtain an independent appraisal of the marital home.

The trial was resumed on May 16, 1977. Petitioner's trial counsel, John Rinella, Esquire, advised the court that an oral agreement had been reached. Petitioner then testified further on direct examination. She affirmed that the parties, with assistance from the trial court, had entered into an oral agreement. Her testimony then covered the following aspects of the property settlement between the parties:

(1) An appraisal showed the value of the marital home to be $129,000 with a mortgage of $25,000. Petitioner testified that she would attempt the sale of the home herself with the understanding that if she did not succeed the property would be sold by a broker. The home was owned in joint tenancy. All net proceeds of the sale were to be evenly divided.

(2) Various shares of stock were jointly owned by the parties. The value of this stock approximated $30,000. All of these shares were to

become the sole property of petitioner and respondent would sign all necessary documents to effect the transfer to her.

(3) The parties had a joint bank account with a balance of $17,000 or $18,000 which petitioner had withdrawn. She was to be permitted to keep all of these funds.

(4) Petitioner was the sole owner of 15 shares of stock in Meyer Bros., Inc., a family business apparently owned in part by the respondent's father. The parties agreed that this stock would be equally divided between petitioner and respondent.

(5) All furniture and furnishings in the marital home would become the property of petitioner except a list of items, upon which the parties were to agree, which would be transferred to respondent. Each party was to keep their automobile as their own property.

(6) Respondent agreed to assign to petitioner all of his interest, if any, in petitioner's dress business. Respondent agreed to hold petitioner harmless from any liability regarding debts that he may have incurred. Each party was to pay their own attorneys' fees. Each was to waive alimony and all future claims against the other.

Petitioner then testified that the joint income tax returns of the parties were under government audit with a claimed delinquency of approximately $12,000. Petitioner was in possession of a refund check covering income taxes in the amount of $5000. Petitioner's counsel, in a leading question, stated that, pursuant to suggestion by the trial court, the refund check was to be applied as payment on account of any liability and the parties would be equally responsible for any balance thereof. Regarding all previous questions, petitioner had promptly noted her assent to all terms of the agreement as mentioned. Regarding this last matter, she stated to the trial court, "I don't agree with that." The court responded, "That's the order of Court." The court stated he had directed that this be done in view of the fact that both of the parties were equally liable upon the tax liability and that each could be compelled to pay all of it.

Petitioner then inquired of the trial court if she would be liable for the entire amount, "Even though I am innocent of it?" The court responded, "But you can't be innocent not when you signed that income tax return." Petitioner responded, "I guess not." She added, "I didn't do the bookkeeping."

Petitioner then testified in response to questions by her attorney that she understood the terms of the oral agreement as it had been "spelled out." Her counsel then again asked, "Now, do you understand the terms here?" Petitioner responded, "Yes, I do." She answered affirmatively to a question by her counsel as to whether she would cooperate with the execution of all documents required to perform the agreement. Petitioner

also told the court that she understood that she did not have to enter the agreement "but as long as you decided to do it, you can't back out of it merely because somebody makes you unhappy about it after you get out of here."

On cross-examination by counsel for respondent, petitioner answered that she understood, of course, that she would be liable for her own attorney's fees. She was also asked if she understood "this full agreement as it was outlined to you by your counsel?" Petitioner answered, "Yes, of course, I understand it." After colloquy between court and counsel, the parties then agreed that petitioner was to have an opportunity to sell the marital home for 90 days before listing it with a broker. Respondent then testified that he understood the terms of the agreement and that he would accept the agreement. The trial court then stated that judgment for dissolution would be entered including the terms of the property settlement agreement as read to the parties.

The record shows next the service of notice of motion upon petitioner and her attorneys by counsel for respondent for the entry of a judgment on June 30, 1977. On that day the court entered an order continuing the motion to July 6, 1977. The motion was then continued to July 12, 1977, and on that day to July 29, 1977.

On August 12, 1977, pursuant to notice, a verified petition of petitioner was filed in open court. The present attorneys for petitioner filed this petition which alleged that petitioner wished a substitution of attorneys. The petition also alleged that respondent has accumulated substantial assets, the extent of which was unknown to petitioner and was unknown at the time of the court hearing. It alleged that petitioner had never been informed of the value of the stock she owned in Meyer Bros., Inc. by her attorney or her husband. In her opinion the stock "may be worth in excess of $100,000, although it had been represented to her by her husband, the Defendant [respondent] herein, that the stock was worth less than $15,000."

The petitioner alleged that by reason of these facts she "did not comprehend the significance of the prior hearing or the alleged oral agreement that she entered into with the Defendant [respondent]." The petition finally alleged that at the time of her testimony she was "emotionally upset and unable to coherently understand and evaluate the terms of the alleged oral agreement." Petitioner alleged that "following the hearing, the Plaintiff [petitioner] felt coerced and forced by her attorney and the Court into agreeing to a settlement which she did not understand nor voluntarily entered into."

On August 12, 1977, after a hearing, the trial court denied the petition and entered the final judgment for dissolution of marriage, incorporating therein the property settlement agreement between the parties in accordance with the testimony previously heard.

The legal principles applicable here have been stated by the courts of Illinois. In *Guyton v. Guyton* (1959), 17 Ill. 2d 439, 161 N.E.2d 832, the supreme court noted that, "In suits for divorce it is a common practice for the parties to voluntarily adjust, subject to the court's approval, the collateral rights arising from the marital relationship * * *." In fact, "The law looks with favor upon the amicable settlement of property rights and is reluctant to disturb decrees based thereon." *Guyton*, 17 Ill. 2d 439, 444.

■■ It follows from this strong policy that where the parties have thus voluntarily adjusted their property rights and their agreement is then incorporated into a judgment, the parties are bound by the settlement. However, this is not a conclusive matter. In *Guyton*, the court cited *James v. James* (1958), 14 Ill. 2d 295, 152 N.E.2d 582, strongly relied upon by petitioner in the case before us, to the effect that a property settlement based upon agreement of the parties will be vacated "for fraud or coercion practiced by either party * * *" or where the settlement is "unfair, inequitable and unjust." (*James*, 14 Ill. 2d 295, 305. See also *Wilke v. Wilke* (1977), 51 Ill. App. 3d 438, 441, 366 N.E.2d 973; *Crawford v. Crawford* (1976), 39 Ill. App. 3d 457, 461, 462, 350 N.E.2d 103.) As above shown, petitioner here takes the position that the agreement was not voluntary and that it was unfair to her.

On the issue of coercion, we note that petitioner does not claim in her brief misrepresentation or coercion of any kind by respondent or by either of the attorneys involved in the trial of the case. On the contrary, petitioner appears to claim that she was coerced by the trial court. Her contention is that this coercion extended only to the matter of the disposition of an alleged delinquency in the payment of Federal income taxes.

In this regard, petitioner was questioned by her own attorney. She testified that there was a claim of a delinquency of almost $12,000 in connection with payment of income taxes on the joint tax returns filed by petitioner and respondent. The record also shows that petitioner had possession of a government refund check pertaining to the matter in the amount of approximately $5000. Petitioner's counsel then put the question to her that pursuant to a suggestion by the trial court "and both of you agreeing" the refund check was to be applied on account of payment of any delinquency with petitioner and respondent to be equally responsible for any balance due. Petitioner responded, "I don't agree with that."

Thereafter there was a colloquy in which all of the parties participated including the trial judge. The judge noted that, in his opinion, this proposal was "very equitable." He pointed out that since both of the parties had signed the joint returns they were jointly and severally bound to pay any liability which might result to the government from the tax returns. Petitioner asked the court if she was liable even though she was "innocent." The court responded that she could not "be innocent not

when you signed that income tax return." Petitioner responded, somewhat enigmatically, "I guess not."

Looking further at the record, the petition filed by petitioner to set aside the property settlement was not directed in any manner to this issue of income tax liability. The verified petition contains allegations regarding the disposition of the stock owned by petitioner in Meyer Bros., Inc. and allegations that petitioner was "emotionally upset and unable to coherently understand and evaluate the terms of the alleged oral agreement." It is quite remarkable that the question of the income tax liability adjustment, which is the sole argument made in this court by petitioner on the issue of coercion or misrepresentation, was not even mentioned in her verified petition.

In addition it must be noted that, after the discussion between the parties on the tax liability, on the next page of the record, in response to a question by petitioner's attorney as to whether she understood the proposed oral agreement, petitioner answered, "Yes, I understand it." She further told the court that she would cooperate with the respondent in the execution of documents required to effectuate the property agreement. On cross-examination petitioner again stated that she understood the full agreement and used the phrase "of course."

■■ The situation before us is in full contrast to cases in which a complicated agreement is presented to a party for the first time with the requirement of instant approval. Petitioner was well represented by able and experienced counsel. The record shows that there had been pretrial conferences on a number of occasions. Depositions had been taken in behalf of petitioner so that she was ostensibly fully informed. Petitioner is not a housewife without business experience. On the contrary, she has been the sole operator of a good-sized business enterprise. Examination of her testimony shows that she is a person of considerable intelligence. There is no hint of any kind in this entire record of misrepresentation or coercion by either counsel in the case or by the respondent. We cannot find from this record evidence of misrepresentation, coercion or overreaching.

The legal authorities relied on by petitioner in this regard do not assist her. For example, in *James*, 14 Ill. 2d 295, 305, the court expressly pointed out that the agreement which was there set aside did not "clearly appear to have been entirely free from coercion and misrepresentation." The court there described the agreement as containing "manifest inequity and unfairness". The agreement was "hastily contrived in the hours immediately before the hearing of the cause." *James*, 14 Ill. 2d 295, 305, 306.

Similarly, in *Crawford v. Crawford*, 39 Ill. App. 3d 457, a property settlement was set aside. There, the testimony of plaintiff showed that "she was neither consulted nor advised as to the nature of the oral

settlement." (39 Ill. App. 3d 457, 460.) Her attorney told her that she could register objections to the settlement with the trial court only through her own attorney. (39 Ill. App. 3d 457, 462.) There also the court pointed out that the settlement agreement "was hastily contrived immediately before the prove-up hearing * * *." 39 Ill. App. 3d 457, 462.

In *Dendrinos v. Dendrinos* (1978), 58 Ill. App. 3d 639, 374 N.E.2d 1016, the court found active misrepresentation by the defendant (respondent). He falsely answered interrogatories with a statement that petitioner had no interest in certain property whereas investigation suggested that the contrary was true. (58 Ill. App. 3d 639, 641.) In fact, this court stated, "We are far from satisfied that the court and counsel adequately discharged their duties to the litigants and the judicial system established to resolve disputes through orderly and fair proceedings." (58 Ill. App. 3d 639, 642.) We find no such situation in the case at bar. We reject the contention of petitioner regarding fraud, misrepresentation and coercion.

On the issue as to whether the agreement is fair and equitable, the primary contention of petitioner is directed at the value of the 15 shares of stock in Meyer Bros., Inc. which she owns. The petition to set aside the settlement alleged that petitioner was never informed of the value of the stock and that she was "of the opinion that said stock may be worth in excess of $100,000." Proper disposition of this contention requires an examination of the various items in the property settlement.

We will note first that generally speaking the financial information concerning these parties shows petitioner to be in a superior financial condition to respondent with reference to earning power. The following is a comparative tabulation of the property which each of the parties would have under the voluntary settlement:

| Petitioner | | Respondent | |
|---|---|---|---|
| Marital home | $ 52,000. | Marital home | $ 52,000. |
| Jointly owned stock | 30,000. | Jointly owned stock | -0- |
| Joint bank account | 17,000. | Joint bank account | -0- |
| | $ 99,000. | | $ 52,000. |

Aside from these items, the automobiles and the household furniture were evenly divided; all interest in petitioner's business was assigned to her and respondent agreed to indemnify petitioner in connection therewith; each party paid their own attorneys' fees; and each waived alimony and all future claims against the other.

The remaining item is the 15 shares of Meyer Bros., Inc. stock owned by petitioner. It is hardly likely that neither petitioner nor her attorney was unaware of the value of this stock. There is nothing to show that the value of the stock had changed in any manner since petitioner acquired it.

The record is bare of any hint or suggestion that respondent was better informed than petitioner concerning the value of this stock. During the time that this case was pending, each of the parties had "ample opportunity to ascertain" the extent and value of the property owned by the other. (See *Kolar v. Kolar* (1977), 47 Ill. App. 3d 37, 40, 361 N.E.2d 751.) In the case before us petitioner herself was owner of the stock. The case was pending from February 17, 1976, to the hearing date of May 16, 1977.

Furthermore, quite aside from the issue as to the exact value of the stock, it would not seem unfair for petitioner to divide this one asset with respondent. Even if the stock were worth as much as $100,000, an assumption completely unsupported by the record, it would not be unfair or inequitable to allow respondent one-half of its value in view of the disparity in the division of property between these parties and the marked difference in their earnings. As above shown, petitioner's business income was $34,395 in 1975 and $40,219.96 for 1974. Respondent reported no income for 1975 and $16,370 for 1974.

After most careful scrutiny of the property settlement and of this entire record, we find no element of inequity or unfairness in the property settlement agreement. The judgment appealed from is accordingly affirmed.

Judgment affirmed.

McGLOON and O'CONNOR, JJ., concur.